John FULFORD, Petitioner-Appellant,

v.

Ross MAGGIO, Jr., Warden, Louisiana State Penitentiary, Respondent-Appellee.

No. 80–3932.

United States Court of Appeals, Fifth Circuit.

Nov. 29, 1982.

Irving J. Warshauer, New Orleans, La. (Court-appointed), for petitioner-appellant.

Wm. R. Campbell, Jr., Asst. Dist. Atty., New Orleans, La., for respondent-appellee.

Appeal from the United States District Court for the Western District of Louisiana.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

## INTRODUCTION

After a jury trial in the District Court for the Fifteenth Judicial District of LaFayette Parish, Louisiana, petitioner, John Fulford, was convicted of murder and sentenced to life imprisonment. His conviction was affirmed on appeal by the Louisiana Supreme Court, *Louisiana v. Nix*, 327 So.2d 301 (La. 1975), and certain related issues were con-

sidered by this court in a decision, *Fulford v. Klein*, reported at 550 F.2d 342 (5th Cir. 1977) (en banc). Here, Fulford advances thirteen issues disputing the district court's denial of his habeas petition. Some raise purely state concerns or are obviously meritless and therefore not deserving of extensive discussion. Others involve potentially problematic aspects of constitutional law and require detailed analysis.

The facts of the present action are well stated in *Louisiana v. Nix*, 327 So.2d 301 (La.1975). The following summation is offered as a guide to the reader. Frank Corso was shot and killed in an apparent burglary attempt on his home in 1971. After a celebrated murder trial, Fulford and his codefendants, Kirksey Nix and Peter Mule, were sentenced to life imprisonment. Their appeal to the Louisiana Supreme Court presented over 100 "bills of exceptions." All were denied. By this time, Fulford was proceeding primarily *pro se*. In 1976 Fulford entered the federal system as a habeas petitioner. Because of exhaustion requirements and other delays, the district court did not issue an order in the case until late 1980. Now, over ten years after his trial, we consider the constitutionality of Fulford's conviction.

### I. *Suppression of Evidence.*

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), enunciates the general rule that suppression of material evidence, which is both requested by and favorable to the defense, is a violation of due process irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87, 83 S.Ct. at 1196. Against this background, Fulford first contends that the prosecution's failure to produce (1) a police report and teletype relating to the murder and (2) the confession of Donald Eugene Smith[1] is a *per se* violation of his constitu-

---

1. Donald Eugene Smith, an inmate at the federal penitentiary in Marion, Illinois, actually made two confessions to the present crime. The first confession is in the form of an affidavit dated December 4, 1971, in which Smith avers that he was in the custody of Jefferson Parish officials on April 28, 1971, and that he had attempted to confess "to the armed robbery and murder that occurred April 11, 1971, at the home of the old man who was killed." Smith claims that he committed the crime with one accomplice and that the two separated

tional guarantees. This argument misreads the primary admonition of *Brady*.

■ The guiding principle of *Brady* is that a jury should be permitted to hear and evaluate all relevant evidence going to a defendant's guilt or punishment. *Id.* To this end, it does not establish a constitutional right to discovery. *Wetherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). Rather, *Brady* requires the prosecution to make available to the defense all requested exculpatory evidence in its possession. In the event requested evidence is not disclosed, *Brady* next requires a determination of whether the prosecution's actions or omissions resulted in substantial prejudice to an accused's defense. *United States v. Felts,* 497 F.2d 80, 82 (5th Cir.1974) (per curiam); *United States v. Watson,* 669 F.2d 1374 (11th Cir. 1982) (rev'd on other grounds). As we note below, we are deeply troubled by elements of this claim, however, we do not find the prejudice necessary to warrant reversal.

It is undisputed that in response to a pretrial *Brady* request the prosecution stated that it held no evidence which the defense might find favorable. Through the good offices of an "insider" at the New Orleans police department, Fulford obtained the evidence that lies at the basis of the present claim. When the fact of this evidence was presented to the prosecution at trial, it again denied the existence of any exculpatory evidence within its files and stated that the police department also had no evidence to offer. The trial record reveals that this was at best an erroneous statement.

■ While we find the turn of events rather suspicious, under the present circumstances Fulford suffered no substantial prejudice. Whatever its source, the disputed police report was used by the defense at trial for purposes of impeachment although it was not admitted into evidence. This report apparently stated that Mrs. Corso had told investigating officers that two men had broken into her home and shot her husband. Further, neither of the men described within the report matched Fulford's appearance. We note, without holding, that the report was in all probability wrongfully withheld by the prosecution. However, because the jury was able to hear and evaluate the exculpatory information contained in the report we do not find reversible error.

Similarly, we find that the information contained in the teletype would be cumulative evidence at best and would not have contributed to a differing jury verdict. *See United States v. Benton,* 637 F.2d 1052 (5th Cir.1981). The teletype message described two suspects who differed in appearance from Fulford, but were similar to his codefendants. However, the teletype also stated that a third, undescribed suspect was also wanted for questioning. We fail to discern the exculpatory effect of such a message.

In addition, the message stated that the suspects were driving a blue Mustang. At trial, Fulford's accomplice, James Knight, who was granted immunity in return for his testimony, stated that he drove a green Oldsmobile to and from the crime. Balanced against this was the testimony of one

after the killing. Reference is again made to "the old man in the New Orleans home robbery," but Corso is not identified by name. The second confession is more conventional, naming an accomplice and specifying the victim. Smith contends that he and one Mike Famiglitti met in New Orleans on April 10, 1971, conspired at Famiglitti's girl friend's home in Gretna, and went to the Corso home the next night in a 1967 blue Mustang. According to Smith, the object of the robbery was $24,000 in cash and five kilos of heroin hidden in Mr. Corso's bowling ball bag. This affidavit is dated June 22, 1973.

It is clear that the prosecution could not have withheld the second Smith confession since it was apparently executed some 15 months after Fulford's trial. The first confession was apparently mailed to Jefferson Parish officials, but it is unclear whether it reached the office of the Orleans officials. Even assuming that the prosecution had received this statement before trial, there is little to connect Smith's confession to the Corso killing other than the reference to the murder of an old man in a New Orleans home.

358

of the defendants' witnesses, Mr. Dittman, to the effect that he had seen a blue Mustang leaving the vicinity of the crime and that he had reported this to the police. Nothing in the record indicates that there was any source, other than Mr. Dittman, for the information in the teletype regarding the Mustang. Since the jury had an opportunity to evaluate the inconsistencies in the prosecution's case we do not find reversible error.

Although our ultimate conclusion must stand, our approach to the confession is a different matter.[2] Donald Smith confessed "to the armed robbery and murder, that occurred April 11th, 1971 at the home of the old man, who was killed" in New Orleans. Smith also claimed that he was the perpetrator of a number of robberies in other states and also attempted to exonerate two of his codefendants who were convicted of yet another robbery. Our reading of the record does not disclose whether this document was actually in the possession of the New Orleans police department. *See* note 1, *supra.* However, such a finding is not necessary to our conclusion. The totality of the evidence requires us to find that the introduction of Smith's confession would not have affected the outcome of Fulford's trial. Accordingly, any error would be harmless beyond a reasonable doubt. *See Clark v. Blackburn,* 632 F.2d 531 (5th Cir. 1980); *United States v. Lay,* 644 F.2d 1087 (5th Cir.1981); *Wiggins v. Estelle,* 681 F.2d 266 (5th Cir.1982).

Two eyewitnesses identified Fulford as one of the perpetrators of the murder. An accomplice, turned government witness, placed him at the scene of the crime. His girlfriend implicated him in the events of that night. In sum the evidence was overwhelming. While the defense presented evidence to contradict the government's case, including alibi witnesses and a witness who strongly suggested that her lover had committed the crime, the jury obviously chose to believe that Fulford was guilty. We do not believe nor can we hold that a vague confession of a convicted felon would have overcome the prosecution's case. Were the evidence less substantial, the interests of justice would require a more complete explanation and inquiry into whether Smith's confession was actually in the possession of the New Orleans police department and by implication, the prosecution. *See* notes 1 and 2, *supra.*

II. *The Jury Venire.*

Fulford's next contention is that the jury venire was unconstitutionally selected because blacks were excluded under the same selection process held to be unconstitutional in *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). *Alexander* held that Louisiana's method for selecting veniremen was not racially neutral[3] and therefore presumptively violative of a black defendant's rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment where no blacks served on that defendant's jury. 405 U.S. at 632, 92 S.Ct. at 1226. It is arguable that Fulford does not have the requisite standing to press such a claim,[4] however, on the

---

**2.** The State's duty of disclosure is imposed not only upon its prosecutor, but also on the State as a whole, including its investigative agencies. Therefore, if the confessions were held by the New Orleans police department we would be compelled to conclude that, constructively, the State's attorney had both access to and control over these documents. *See United States v. Bryant,* 142 D.C.App. 132, 439 F.2d 642, *on remand,* 331 F.Supp. 927, *aff'd,* 145 D.C.App. 259, 448 F.2d 1182 (1971); *United States v. Jensen,* 608 F.2d 1349 (10th Cir.1979).

**3.** The Louisiana system required prospective jurors to complete an information form which requested their race. Against this background

the Court held that the petitioner made out a *prima facie* case of invidious discrimination in the selection of the grand jury that indicted him because the State could not adequately justify the disproportionately low number of blacks that served on juries as opposed to the percentage of blacks in the community at large. 405 U.S. at 631–632, 92 S.Ct. at 1225–1226.

**4.** Facially, *Alexander* holds that the constitutional rights of a racially identifiable minority are presumptively violated under certain circumstances. It may be that the Court's decision in *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), where it held that deprivation of a jury that does not represent a

present facts we need not reach this issue. Fulford has not submitted evidence to establish the racial composition of the petit jury venire, a threshold requirement for comparing the percentage of blacks on the venire with the percentage of blacks in the community at large. 405 U.S. at 630, 92 S.Ct. at 1225. Moreover, Fulford has not demonstrated that the selection process used in 1968 when Alexander was tried was still in effect four years later. In consequence, this argument presents no ground for habeas relief.

### III. *Ineffective Assistance of Counsel.*

Fulford next raises the customary ineffective assistance of counsel claim. To this end he lists a number of "failures" on the part of his counsel, Wayne Mancuso. We note at the outset that within this circuit "[w]e interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* effective assistance." *Mackenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960) (emphasis original), *adopted on rehearing en banc,* 289 F.2d 928 (5th Cir.), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). Against this standard, our review of the record reveals Fulford's claim to be without merit.

Mancuso and his co-counsel, Roehm West, preserved and presented over 100 points of error to the Louisiana Supreme Court. They effectively cross-examined witnesses and, in the face of eyewitness testimony, constructed a plausible defense theory. In light of our reading of the record we are not compelled to review each of Fulford's individual allegations of ineffective assistance. We must, however, address his assertion that Mancuso became so emotional after his final argument that he left the courtroom because in connection

with this alleged event, and as a separate ground for reversal, Fulford contends that the prosecution made prejudicial remarks during its rebuttal argument, remarks that went unchallenged owing to Mancuso's absence and resulted in substantial prejudice to his defense. The record reflects that the prosecution both insinuated that Fulford would not have been arrested were he not guilty and referred to the defense's expert witness as "Dr. Strangelove."

It is beyond peradventure that in federal habeas corpus actions, "[i]mproper jury argument by the prosecution does not present a claim of constitutional magnitude ... unless such argument is so prejudicial that the applicant's state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment." *Bronstein v. Wainwright,* 646 F.2d 1048, 1056 (5th Cir. 1981), *quoting, Alvarez v. Estelle,* 531 F.2d 1319, 1323 (5th Cir.1976). To establish that a prosecutor's remarks are so inflammatory as to prejudice the substantial rights of a defendant, the defense must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred. *See Gethell v. United States,* 282 F.2d 681 (5th Cir.1960) (persistent misconduct and inflammatory statements reversible error); *United States v. Carrillo,* 565 F.2d 1323 (5th Cir.1978) (characterization of defendant as narcotics addict not reversible error); *United States v. Hughes,* 658 F.2d 317, 323 (5th Cir.1981) (prosecutor's remark that defendant looked like a drug dealer not reversible in light of substantial evidence).

As we noted above, the evidence against Fulford was substantial—if not overwhelming. While we might condemn the prosecutor's intemperate remarks on direct review, in light of the evidence we do not believe

cross section of the community is violative of an accused's constitutional rights, permits Fulford to bring suit in accordance with *Alexander,* however, we have not and need not today define the precise interrelationship of these cases. Nor, in view of our disposition, need we

consider the application here of our decision in *Watson v. United States,* 484 F.2d 34 (5th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974), that the principles enunciated in *Peters* had no retroactive application.

that they deprived Fulford of a fundamentally fair trial. Moreover, considering the length of the trial and that it was highly publicized and emotional, counsel for both sides maintained admirable decorum. The prosecution's remarks at the end of such a hotly contested proceeding are regrettable. However, they do not rise to the stature of constitutional error.

Our analysis indicates that Fulford has presented neither evidence that Mancuso was absent during the prosecution's rebuttal argument nor sufficient ground to warrant a finding of ineffective assistance of counsel if he was absent. After Mancuso's closing argument, the court took a five-minute recess. When proceedings resumed, and immediately prior to the prosecution's rebuttal, the record reveals that Mancuso waived polling the jury. This suggests that Mancuso was present during the rebuttal, however we do not rest our conclusion on the probability that he did not absent himself. The record reflects that West, Fulford's other lawyer, played an active role in his defense and was present during the rebuttal argument. Why he did not object to the prosecution's statements is a matter of conjecture. It is possible that counsel concluded that an objection would underscore the prosecution's argument. In any event, we will not impose our conceptions of trial tactics, developed with the aid of hindsight and reflection, where a defendant's counsel has presented a vigorous and well reasoned defense. *Beckham v. Wainwright,* 639 F.2d 262 (5th Cir.1981).

### IV.  *Competency Hearing.*

Fulford next alleges that his conviction was obtained unconstitutionally because the trial court denied a defense motion to impanel a sanity commission.[5] Specifically, the petitioner argues that the medical testimony of Dr. McCray was unrebutted, and that the district judge abused his discretion by refusing to establish the commission.

It is clear that due process is denied to an incompetent criminal defendant who is required to stand trial. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). A habeas petitioner who contends that he was entitled to a competency hearing must demonstrate that the trial court was aware of matters which raised at that time a "real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel." *Bruce v. Estelle,* 483 F.2d 1031, 1043 (5th Cir.1973); *Pedrero v. Wainwright,* 590 F.2d 1383 (5th Cir.1979).

Here, appellant offered the testimony of Dr. William McCray, a qualified psychiatrist, who examined Fulford in his cell for about 50 minutes on the day before trial. Dr. McCray noted that an evaluation usually requires several sessions as well as a supporting evaluation from a clinical psychologist. Finding Fulford to be well oriented to time, place and person, Dr. McCray nevertheless testified that Fulford had paranoid delusions which rendered him incompetent to stand trial. Specifically, Fulford had told Dr. McCray that he was withholding the names of alibi witnesses who could prove his innocence for fear that they would be arrested and prevented from testifying in his behalf.

In its *per curiam* giving reasons for denying the motion, the trial court noted that Fulford "was oriented as to time, date and place and was cognizant of everything around him." The court further stated that it considered the motion a subterfuge on Fulford's part to effect a severance from his codefendants. Moreover, the court noted that the defendant called alibi witnesses who testified in his behalf. On appeal the Louisiana Supreme Court relied heavily on the trial court's observations of Fulford at the preliminary hearing and trial in holding that "[t]he judge's findings [were] amply supported by the record." 327 So.2d at 324. We do not agree.

5.  La.Code Crim.Pro.Ann. Art. 644 empowers the trial court to appoint a commission of at least two qualified physicians to "examine and report upon the mental condition of a defendant."

We are mindful that we are a federal court reviewing a state court conviction. In consequence, absent a violation of an accused's constitutional rights, we must defer to the state court's findings of fact. *See Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Here, we cannot defer.

The State urges that Fulford had the capability to assist his attorney but simply refused to do so. But if this refusal was based on his paranoid delusions, it cannot be successfully urged that Fulford was actually capable of assisting counsel. A more troubling aspect of the present issue is the trial court's finding that Fulford was trying to delay the trial, and possibly obtain a severance. Given the timing of the motion, and a subsequent request by Fulford for a severance, we would uphold the trial court if it had been confronted by a bare-bones motion, with only the statement of Fulford's attorney as support. That is not the present case. Dr. McCray's testimony was unimpeached. His qualifications as a psychiatrist were unchallenged by the prosecution. Although his examination was brief, it was precisely because of this brevity that he suggested further evaluation was needed. On these facts, we believe that the state court committed constitutional error in not conducting further competency proceedings.

The State also insists that subsequent events confirmed that Fulford was misleading Dr. McCray. Two alibi witnesses did testify for Fulford. However, Fulford insists that he had other supportive witnesses, and that his codefendants' wives, rather than he, gave his attorneys the names of the women who testified on his behalf. Moreover, his attorneys stated that Fulford refused to assist in jury selection. We do not pass on the validity of appellant's contentions, for our plain answer is that we cannot determine from the record the extent to which Fulford took an active role in his defense.

We realize that "[t]he question [of competency] is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope, supra,* 95 S.Ct. at 908. Because the vagaries of the human mind do not lend themselves to precise analysis, and because of the fundamental importance of ensuring that an accused be aware of and able to participate fully in his trial, procedural safeguards must be substantial barriers—not readily open to abuse or indiscretion. Under our system of laws we entrust judges and jurors, who are for the most part untrained in this area, to make ultimate determinations of competency. *See White v. Estelle,* 669 F.2d 973 (5th Cir.1982). It is of paramount importance— both to society and to the accused—that the fact-finding process and the determinations which evolve from that process be based upon information sufficient to permit a trier of fact reasonably to assess an accused's competency against prevailing *medical* and *legal* standards.

Because of Dr. McCray's testimony and the lack of support in the record for the reasons given by the trial judge for denying a competency hearing, we cannot, with the certitude befitting a federal court, affirm that Fulford possessed the mental competency to participate meaningfully in his trial.[6] *But see State v. Nix,* 327 So.2d 301, 323–24 (La.1975). Accordingly, we remand the case to the district court for a determination of whether an adequate *nunc pro tunc* inquiry can be held regarding Fulford's competency in 1972. We do not define the exact contours of such an inquiry. The passage of time may make such an inquiry impossible. However, the nature of Fulford's alleged disorder and resolution of factual questions concerning his partici-

---

**6.** Our holding today does not divest a trial judge of his discretion to determine the competency of an accused. Nor does it suggest that medical testimony may be rebutted only by testimony similar in kind. We do hold, however, that where an accused establishes a *pri-* *ma facie* case of incompetency, through the introduction of expert testimony, it is incumbent upon the trial court to delineate expressly his reasons for rejecting such testimony and that such rejection be supported by the record.

pation at trial may permit such a *post hoc* determination. *See Lokos v. Capps,* 625 F.2d 1258, 1268 at n. 5 (5th Cir.1980). We leave this determination to the district court. If it is found that a competency determination is not possible, then the State must either recharge and retry Fulford or release him from custody.

### V. *Pro Se Defense.*

Fulford also contends that he was unconstitutionally denied the right to defend *pro se,* either with or without the assistance of counsel, in violation of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). If our remand results in a finding that Fulford was competent during his trial, the question of his right to defend *pro se* will resurface. Therefore, to avoid the possibility of yet another appeal, we now address this issue.

An examination of *Faretta* reveals its inapplicability to the present action. There the defendant, from the outset, refused court appointed counsel and indicated his preference to defend in proper person. The trial judge was aware of Faretta's decision several weeks before trial but nevertheless ordered him to be represented by the office of the public defender. Here, Fulford retained his own attorney and did not express his desire to defend in proper person until after the jury had been selected and sworn.

■ While this circuit has not definitively ruled on the present issue, we find nothing in *Faretta* to suggest that the Court intended to overrule the numerous decisions holding that the trial court may properly deny a defendant's motion to defend *pro se* when it is not made until the day of trial. Accordingly, it is our view that once trial begins the right to defend in the proper person ceases to be absolute. At that point it lies within the trial court's discretion whether to permit the accused to proceed *pro se.* In reaching its decision, the trial court must balance whatever prejudice is alleged by the defense against such factors as disruption of the proceedings, inconvenience and delay, and possible confusion of the jury. *Sapienza v. Vincient,* 534 F.2d 1007, 1010 (2d Cir.1976); *United States v. Lawrence,* 605 F.2d 1321 (4th Cir.1979). We will review such a determination only for an abuse of discretion. *Id.*

■ We note that ordinarily a dialogue between the court and the defendant will help effectuate consideration of the reasons underlying an accused's request. Such a dialogue will also assist in determining the trial court's probable reasoning in the grant or denial of an accused's motion where, such as here, the court has not expressly stated its reasons. On the present facts the absence of such a dialogue is not fatal. The trial court was presented with a *pro se* motion made by a defendant who, the previous day, had requested a competency hearing. Since trial had commenced, the resolution of that motion was solely within the sound discretion of the trial court. We find no abuse.

### VI. *Remaining Claims.*

Fulford's remaining claims do not merit extensive discussion. Briefly, he asserts that he was denied both pretrial inspection of certain evidence and the right to testify. The record does not support the latter and the former has no basis in prevailing case law. *See White v. Maggio,* 556 F.2d 1352 (5th Cir.1977). Similarly, Fulford's allegations regarding the jury charge are not supported by the record.

For the reasons set forth above, we vacate the judgement below and remand the case to the district court for proceedings not inconsistent with this opinion.

**VACATED AND REMANDED.**