524 A.2d 117

**Michael Carlton SMITH**

v.

**STATE of Maryland.**

**No. 1210, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

April 20, 1987.

166

W. Ralph Birt, Jr., Assigned Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Alexander Williams, Jr., State's Atty. for Prince George's County and David M. Simpson, Asst. State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before ALPERT, ROBERT M. BELL and WENNER, JJ.

ALPERT, Judge.

Unwilling to spend the rest of his life behind bars, appellant Michael Carlton Smith challenges his conviction, *inter alia,* on the basis that he was denied his right of self-representation. The facts are as follows.

On November 19, 1985, appellant was named in a twenty-four count indictment alleging the commission of first and second degree rape, false imprisonment, kidnapping, assault with intent to murder, assault and battery, weapons charges and various other related sexual offenses, all stemming from an alleged attack on Roberta Spann on September 21, 1985. A motion in limine and various pre-trial motions to suppress physical evidence, statements, and photographic identifications were heard and ruled on by the trial court. In particular, the trial court denied appellant's motion to represent himself and granted, pursuant to the Maryland Rape Shield Statute,[1] the State's motion to preclude testimony by the victim concerning her prior sexual conduct.

Appellant was tried before a jury in the Circuit Court for Prince George's County. The State's case consisted primarily of the testimony of the victim as to the particulars of the incident. Medical evidence as to the victim's condition immediately following the incident was admitted in corroboration of her story. In addition, several policemen and a lay witness testified concerning the factual surroundings of the incident and the chain of custody of certain physical evi-

---

1. Md.Ann.Code art. 27, § 461A (1982).

dence. At the conclusion of the State's case, the defense moved for judgment of acquittal, which motion was denied.

Counsel for the defense then sought to call the victim, Ms. Spann, as a witness in the presentation of its case. The State objected and moved to preclude the defense from calling the victim on the basis of the Maryland Rape Shield Statute. The trial court granted the State's motion. With that, the defense rested, presenting no evidence.

The jury found the appellant guilty of three counts of rape, one of kidnapping, one of attempted murder, and two of deadly weapon charges. The court merged one rape count with the other two. The defense moved for a new trial, which motion was also denied. On September 9, 1986, appellant was sentenced to two consecutive life terms on the rape convictions, thirty years for kidnapping, thirty years for assault with intent to murder, and three years on each of the two weapons charges (all concurrent with the life sentences).

Appellant filed a timely appeal and presents the following two questions:

1. Did the trial court commit error in denying appellant's request to represent himself at trial?

2. Did the trial court misconstrue and misapply the Maryland Rape Shield Law so as to deny appellant his right to present a defense and to otherwise improperly exclude relevant evidence.

We will address each question in turn.

I. *The Right to Self-representation*

■ Appellant first contends that he was denied his Sixth Amendment right to self-representation.[2] A criminal defendant has two mutually exclusive rights under the

---

2. The Sixth Amendment to the United States Constitution, made applicable to the states through the due process clause of the Fourteenth Amendment, reads in pertinent part:
 In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.
 U.S. Const. amend. VI.

Sixth Amendment: the right to effective assistance of counsel and the right to represent himself. *Leonard v. State,* 302 Md. 111, 486 A.2d 163 (1985). The right to self-representation is absolute upon a valid waiver of the right to assistance of counsel. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Leonard,* 302 Md. at 119, 486 A.2d 163; *Cummings v. Warden,* 243 Md. 702, 703, 221 A.2d 908 (1965); *Hamilton v. State,* 30 Md.App. 202, 205, 351 A.2d 153 (1975). When a defendant indicates that he wishes to defend *pro se,* the court must determine whether he "truly wants to do so." *Faretta,* 422 U.S. at 817, 95 S.Ct. at 2532; *Snead v. State,* 286 Md. 122, 128, 406 A.2d 98 (1979). Thus, a two-step judicial inquiry must be made. *Colvin v. State,* 299 Md. 88, 100, 472 A.2d 953 (1984); *Snead,* 286 Md. at 128, 406 A.2d 98. The court must first ascertain whether the defendant "clearly and unequivocally" wants to defend himself. *Id.* If the court so ascertains, it must then inform the defendant of the benefits of counsel and the dangers of proceeding without counsel and inquire whether the accused "knowingly and intelligently" desires to forgo those benefits. *Faretta,* 422 U.S. at 821, 95 S.Ct. at 2534; *Snead,* 286 Md. at 121, 406 A.2d 98; *Meyer v. State,* 49 Md.App. 300, 306–07, 431 A.2d 738, *cert. denied,* 291 Md. 779 (1981); *Hamilton,* 30 Md. App. at 204, 351 A.2d 153. "The record must show that the defendant was competent to waive the right to counsel and that he knowingly and intelligently has done so after being made aware of the advantages and disadvantages of self-representation." [3] *Snead,* 286 Md. at 129, 406 A.2d 98,

---

**3.** The Maryland Rules provide procedural safeguards to assure that defendants are well appraised of these Sixth Amendment rights:

(a) First Appearance in Court Without Counsel.—At the defendant's first appearance in court without counsel, the court shall:

(1) Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel.

(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.

quoting *State v. Renshaw,* 276 Md. 259, 267, 347 A.2d 219 (1975) (footnote omitted). *See also Thompson v. State,* 284 Md. 113, 123, 394 A.2d 1190 (1978); *Hamilton v. State,* 30 Md.App. 202, 204, 351 A.2d 153 (1976).

■ The question of how a court is to measure the validity of each defendant's waiver of his right to counsel has troubled the judicial system since the *Faretta* holding was announced by the Supreme Court. *See, e.g., Faretta v. California,* 422 U.S. 806, 852, 95 S.Ct. 2525, 2549, 45 L.Ed.2d 562 (1975) (Blackmun, J. and Rehnquist, J., dissenting) (many of the questions left unanswered by the majority opinion "such as the standards of waiver ... will haunt the trial of every defendant who elects to exercise his right to self representation"). It is clear, however, that competency to stand trial and competency to make a knowing and intelligent (*i.e.,* a constitutional) waiver of the right to counsel are not necessarily the same. *Snead,* 286 Md. at

---

(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

(4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.

(5) If trial is to be conducted on a subsequent date, advise the defendant that if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel.

The clerk shall note compliance with this section in the file or on the docket.

(b) Express Waiver of Counsel.—If a defendant who is not represented by counsel indicates a desire to waive counsel, the court may not accept the waiver until it determines, after an examination of the defendant on the record conducted by the court, the State's Attorney, or both, that the defendant is knowingly and voluntarily waiving the right to counsel. If the file or docket does not reflect compliance with section (a) of this Rule, the court shall ensure that compliance with this section is noted in the file or on the docket. At any subsequent appearance of the defendant before the court, the docket or file notation of compliance shall be prima facie proof of the defendant's express waiver of counsel. After there has been an express waiver, no postponement of a scheduled trial or hearing date will be granted to obtain counsel unless the court finds it is in the best interest of justice to do so.

Md. Rule 4–215(a) and (b).

129 n. 5, 406 A.2d 98; *Renshaw,* 276 Md. at 267 n. 3, 347 A.2d 219. *See also Chapman v. United States,* 553 F.2d 886, 892 n. 10 (5th Cir.1977) and cases cited therein. *Compare United States v. Smith,* 778 F.2d 925, 931 (2nd Cir. 1985) ("waiver of right to counsel under sixth amendment is to be measured by a stricter standard than is a similar waiver under the fifth amendment.") For example, there may be a situation in which a defendant has the ability to understand the nature of the proceedings against him and assist counsel in his defense, but lacks the mental capacity to waive counsel and represent himself. *See United States v. Dougherty,* 473 F.2d 1113, 1123 n. 13 (D.C.App.1972).

■ The validity of a defendant's waiver of counsel must be determined in light of the facts and circumstances surrounding each case. *United States v. Johnson,* 659 F.2d 415, 416–17 (4th Cir.1981). Among factors uniformly considered are the background, experience, age, general capabilities and conduct of the accused.[4] *McQueen v. Blackburn,* 755 F.2d 1174 (5th Cir.1985); *Johnson,* 659 F.2d at 417; *United States v. King,* 582 F.2d 888, 890 (4th Cir. 1978). Factors, less uniformly, but also considered include: familiarity with the court system, *Cordoba v. Harris,* 473 F.Supp. 632, 638, *aff'd,* 614 F.2d 1286 (S.D.N.Y.1979), the existence of a history of irrational behavior, and medical opinions regarding the defendant's mental abilities. *Evans v. Raines,* 534 F.Supp. 791, 795 (D.Ariz.1982). *Compare Stepp v. Estelle,* 524 F.2d 447, 453–5 (5th Cir.1975) (attempted suicide alone does not evidence insufficient mental capacity to make knowing and intelligent waiver of right to

---

**4.** *But see* Note, *Constitutional Law—Criminal Procedure—Independent Right of Self-Representation in Sixth Amendment Permits Defendant To Act As Own Lawyer at State Criminal Trials,* 61 Cornell L.Rev. 1919, 1040 n. 134 (1976), wherein it was said:

The level of the defendant's education, intelligence, knowledge of the law, and experience with legal proceedings may have significant bearing on the defendant's success. *See, e.g., United States v. Calabro,* 467 F.2d 973 (2d Cir.1972). These factors, however, are not determinative of whether the defendant may represent himself. *Id.*

counsel). "Technical legal knowledge, as such, is not relevant to an assessment of an accused's knowing exercise of his right to defend himself." *Snead,* 286 Md. at 129, 406 A.2d 98, citing *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541. *See also United States v. Bennett,* 539 F.2d 45, 51 (10th Cir.1976) (court determination that an accused lacks expertise or professional capabilities cannot justify denying the right of self-representation). *Compare United States v. Smith,* 780 F.2d 810, 812 (9th Cir.1986) (court may not base its denial of a request to proceed *pro se* on defendant's inexperience or lack of confidence).

Before discussing the application of these factors to the case *sub judice,* we pause to consider the factual backdrop on which the *Faretta* decision itself was based. Anthony Faretta was charged with grand theft. Well before the trial, Faretta requested that he be permitted to represent himself.[5] "Questioning by the judge revealed that Faretta had previously represented himself in a criminal prosecution, that he had a high school education, and that he did not want to be represented by the public defender because he believed that that office was 'very loaded down with . . . a heavy case load.' " 422 U.S. at 807, 95 S.Ct. at 2527. The trial judge *sua sponte* held a hearing to inquire into Faretta's ability to conduct his own defense. Specifically, he questioned Faretta regarding his knowledge of the hearsay rule and the State law concerning juror selection. 422 U.S. at 808, 95 S.Ct. at 2527. On the basis of this inquiry, the judge ruled that Faretta had not made an intelligent and knowing waiver of his right to assistance of counsel, 422 U.S. at 809, 95 S.Ct. at 2529. The judge also concluded that Faretta had no constitutional right to proceed *pro se.* 422 U.S. at 810, 95 S.Ct. at 2529. Accordingly, the judge also

---

**5.** A long line of cases hold that the defendant's absolute right to proceed *pro se* ends once trial has begun, and then the granting or denial of the defendant's motion is within the trial judge's discretion. *See, e.g., Fulford v. Maggio,* 692 F.2d 354, 362 (5th Cir.1982), *on remand,* 715 F.2d 162, *rehearing denied,* 104 S.Ct. 29; *United States v. Dunlap,* 577 F.2d 867, 868–9 (4th Cir.1978).

denied Faretta's requests for leave to act as co-counsel and to make certain motions on his own behalf. The public defender assigned to Faretta conducted the entire defense, at the end of which Faretta was found guilty as charged. The California Court of Appeals affirmed the conviction; the California Supreme Court denied review; the United States Supreme Court granted certiorari. 422 U.S. at 812, 95 S.Ct. at 2529.

After reviewing the history of criminal jurisprudence which influenced the framing of the Constitution and the Bill of Rights, the Supreme Court determined that "[t]he right of self-representation finds support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged." 422 U.S. at 818, 95 S.Ct. at 2532. Although the court recognized that it may be to the defendant's disadvantage to forgo the assistance of a lawyer, the court determined that "the colonists and the framers, as well as their English ancestors, always conceived of the right to counsel as an 'assistance' for the accused, to be used at his option, in defending himself." 422 U.S. at 832, 95 S.Ct. at 2539. The court explained:

> [I]t is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice.
>
> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to

believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." *Illinois v. Allen*, 397 U.S. 337, 350–51 [90 S.Ct. 1057, 1064] 25 L.Ed.2d 353 (Brennan, J., concurring).

*Id.* at 833–34, 95 S.Ct. at 2540–41.

Applying these principles, the Supreme Court held that Faretta had been unconstitutionally denied his right to self-representation. *Id.* at 835–6, 95 S.Ct. at 2541. Faretta had clearly and unequivocally declared to the trial judge that he did not want counsel, but wanted to represent himself. The record affirmatively showed "that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." *Id.* at 835, 95 S.Ct. at 2541. Moreover, the trial judge had warned Faretta of the hazards of forgoing counsel and that he would be required to follow the standard rules of trial procedure. The Supreme Court stated, in concluding, that:

We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the

California courts deprived him of his constitutional right to conduct his own defense.

*Id.* at 836, 95 S.Ct. at 2541.

In the case *sub judice,* the defendant clearly and unequivocably asserted his right to self representation.[6] *See Leonard,* 302 Md. at 124, 486 A.2d 163. Thus, the first step of the *Snead* inquiry was satisfied and the trial judge properly began to determine whether the defendant was capable of making a knowing and intelligent waiver of the right to counsel. The judge asked appellant about his educational background; whether he knew the nature of the charges against him and the allowable penalties for those charges; whether he was informed of his right to have an attorney and why he wanted to proceed *pro se.* Appellant indicated that he had earned a G.E.D. and completed two years of college. He said that, "I read on an 8.4 reading level. I have read a lot of law." He acknowledged having been advised of the charges against him, as well as the potential penalties he faced. He also acknowledged having been informed of his right to have an attorney. When asked why he did not want to use his court-appointed attorney, appellant clearly and lucidly articulated his reasons:

> THE COURT: You have assisted [the public defender] with the preparation of your trial?

---

**6.** Prior to trial, the following colloquy occurred:
THE COURT: Mr. Smith, Michael Carlton Smith, do you want to stand up.
MR. SMITH: Yes, ma'am.
THE COURT: Do you really want to represent yourself?
MR. SMITH: Yeah.
THE COURT: Why?
MR. SMITH: Well, the Public Defender's Office is not pursuing the defense that I originally asked for. The psychiatric examination was incomplete. It was done under other than therapeutic conditions. I was brought around in shackles, taken back to the place. They didn't have a cardiograph. I have a medical problem. They refused to do the X-rays and verify it. I have been taking medication for six years. I feel I would be better off to get some time and do it myself.

MR. SMITH: I have cooperated with him. We are not—this hasn't been prepared the way I asked, not in the beginning, not now.

THE COURT: You want him to pursue the insanity defense; is that correct?

MR. SMITH: Yes, ma'am.

THE COURT: He has apparently decided not to pursue the insanity defense.

MR. SMITH: Therefore, he is not acting in my best interest.

THE COURT: Not necessarily.

MR. SMITH: What I want to say about the extension without confessing anything is that I would—what I need to have time for and the defense I plan on putting on—I would be willing to waive any future rights to question Ms. Spann on anything she said or any statements in the State's case and accept for them to enter a deposition from her at the time that this thing comes to trial.

I have no intention of doing more harm to that woman by asking her a lot of questions, and I am not going to challenge what she says. I am basing my defense and I believe there was sufficient time. There were some letters I have sent to Johns Hopkins. I believe within 90 days I can have this defense. It is entirely medical. I have a medical problem. It shows up in X-rays and I have been taking medicine for it for years. That relieves me of the ability to control myself. That is going to be my defense. I need time to get the necessary documentation for that together to present to this Court. Other than that, they do what they want to do. They are doing it against my wishes. They are not acting in my best interest as far as I am concerned.

After eliciting the State's response to appellant's request for a continuance,[7] the trial judge quizzed appellant on his

7. The State objected to the granting of a continuance, since their chief witness (the victim) would soon be leaving town for an indefinite period of time.

knowledge of certain evidentiary concepts.[8] The court then asked the appointed public defender why he chose not to pursue appellant's defense strategy.[9] Whereupon the court made the following ruling:

> THE COURT: Mr. Smith, you do have a right to represent yourself. There is no question about that. It is a very dangerous thing to do, and a judge has to make an indepth inquiry about your ability to do that. You have

---

8. The following colloquy occurred concerning appellant's knowledge of the rules of evidence:

 THE COURT: Do you know how to cross-examine a witness:

 MR. SMITH: There is no witness to cross-examine.

 THE COURT: Do you know how to cross-examine?

 MR. SMITH: I know the basic guidelines of certain questions I can ask and certain questions I cannot ask because they are not relevant.

 THE COURT: Do you know what the hearsay rule is?

 MR. SMITH: I believe you are saying that he said something and he has to repeat it. I can't say that he said this.

 THE COURT: Good. Do you know that there are exceptions to the hearsay rule? Do you know what the exceptions are?

 MR. SMITH: I know there are exceptions to every rule. No, I am not a lawyer. I am not trying to insult the Court's intelligence by saying I am. I think that since the Public Defender's Office is not prepared to pursue my defense the way I want, I would like to do it myself. I can't do it any worse.

9. On this point, the following exchange took place:

 THE COURT: You understand his theory that he is not guilty because he is not responsible?

 MR. BUCHHEISTER: Yes.

 THE COURT: You made a tactical decision not to pursue that defense?

 MR. BUCHHEISTER: I made a tactical decision, Your Honor, because all of the medical reports in his history have been verified recently from Perkins that while the Defendant has certain problems and whatnot, that he was criminally responsible. Mr. Smith has been examined repeatedly since he began his journey in the judicial system probably ten or twelve years ago, and I have gotten voluminous reports that have come in from where he has been incarcerated before and have always indicated that while he had problems, he was competent and that those reports have been borne out by the doctors at Perkins. I have discussed that with Mr. Smith and Mr. Smith believes that the doctors—once they make an initial evaluation, they are not about to change it. He does not trust the doctors at Perkins, but my personal evaluation is that he is going to be found responsible and that there are alternative defenses in the case.

to know when to object, when evidence is inadmissible. You have to know the rules of opening and closing arguments. I don't feel that you have had enough education or experience to do that.

If I were to permit you to represent yourself, I don't think that you would have the wherewithal to know how to request motions for appropriate relief, to obtain orders for independent psychiatric evaluations or medical evaluations. They have already been done in the case.

I would have to also take into consideration a continuance, granting a continuance that the State is hard pressed to get its witness back. It is critical and essential in this case. That witness is leaving the country. I feel that Mr. Buchheister's appearance has been in here since December 13 of 1985. He was assigned to the case. He has been working the case. He has indicated to the Court that he has made a tactical decision and the Court cannot question his tactical decisions. He does have alternate defenses.

I feel that in the best interest of justice, the Court will have to deny your request to represent yourself. All right. Any other preliminary matters before we bring the jury in?

. . . . .

MR. BUCHHEISTER: Your Honor, you made a finding that Mr. Smith has a—that I am going to represent him?
THE COURT: You are going to represent him. I denied his motion to allow him to represent himself. Defendants have the right to waive counsel. That is clear by the law and by our rules. He has made a motion to waive counsel and to represent himself. I have denied that motion.
MR. BUCHHEISTER: It was just my understanding of the law—and I am certainly not an expert on it—that he has an absolute right to represent himself.
THE COURT: There have been some Supreme Court cases that have upheld a person's right to represent himself, but we can talk about that later.

 Considering the facts and circumstances of this case, we hold that the trial court's denial of appellant's request to represent himself was erroneous. *Faretta* and its progeny clearly state that, although a judge must make an inquiry into the defendant's ability to make a knowing and intelligent waiver of the right to counsel, an assessment of the defendant's "technical legal knowledge ... [is] not relevant to an assessment of his knowing exercise of his right to defend himself." 422 U.S. at 536, 95 S.Ct. at 2541; *Snead,* 286 Md. at 129, 406 A.2d 98. Although the trial judge, in the case *sub judice,* indicated that she did not believe Mr. Smith was capable of making a knowing and intelligent waiver of his right to counsel, she couched her reasons for so finding in terms of his ability to carry out an effective defense. This is an improper consideration in assessing the defendant's right to defend himself. For purpose of determining whether an accused should be permitted to represent himself, the *only* relevant inquiry is his ability to make a knowing and intelligent waiver. The defendant's ability to carry out an effective defense is completely irrelevant to his ability to make an effective waiver, and is an improper consideration in the judge's determination whether to allow the defendant to proceed *pro se. United States v. Bennett,* 539 F.2d 45 (10th Cir. 1976), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1977). As Justice Blackmun said in criticism of the *Faretta* decision:

> If there is any truth to the old proverb that "[o]ne who is his own lawyer has a fool for a client," the Court by its opinion today now bestows a *constitutional* right on one to make a fool of himself.

422 U.S. at 852, 95 S.Ct. at 2549 (Blackmun, J., dissenting). We hold that the trial court erred in denying appellant his constitutional right to self-representation.[10]

---

**10.** We note, however, that the trial court's error extends only to the denial of the defendant's right to proceed *pro se.* The trial judge was clearly within her discretion in denying appellant's requested continu-

## II. *Rape Shield Statute*

 Appellant next argues that the trial court erred in its interpretation of the Rape Shield Statute and its application to the case *sub judice.* After the close of the State's case, appellant attempted to call the prosecutrix to the stand. The State moved to preclude any testimony concerning the victim's prior sexual conduct. Appellant asserted that such testimony was necessary to explain the source of the semen. The trial court granted the State's motion and precluded the testimony. Appellant, therefore, rested without offering any further evidence,[11] and contends, on appeal, that "[t]his action by the trial court [in precluding the testimony] was prejudicial error of constitutional magnitude depriving the appellant of his right to due process of law under the 14th Amendment to the United States Constitution." We disagree and explain as follows:

The Maryland Rape Shield law states, in pertinent part:

(a) *Evidence relating to victim's chastity.*—Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of specific instances of the victim's prior sexual conduct *may* be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

(1) Evidence of the victim's past sexual conduct with the defendant; or

---

ance. Moreover, the trial judge could properly have given the defendant the choice either to proceed *pro se* on the date of trial or proceed with counsel. Md. Rule 4–215. *See also Fulford v. Maggio,* 692 F.2d 354, 362, on remand, 715 F.2d 162, *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 29, 77 L.Ed.2d 1451 (5th Cir.1982); *United States v. Dunlap,* 577 F.2d 867 (4th Cir.1978); *Fowlkes v. State,* 67 Md.App. 102, 506 A.2d 660 (1986).

11. The appellant elected to exercise his constitutional right not to testify.

(2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or

(3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or

(4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

Md.Ann.Code art. 27, § 461A (1982) (emphasis added). The statute, thus, places three conditions upon the admissibility of evidence of the victim's prior sexual conduct: (1) the evidence must be relevant and material to an issue in the case, (2) the prejudicial nature of the evidence must not outweigh its probative value, and (3) the evidence must fall within one of the four statutorily enumerated categories. *Joyce v. State,* 59 Md.App. 237, 246, 474 A.2d 1369 (1984). In evaluating these three conditions, decisions on the relevance or inflammatory nature of the evidence rest in the sound discretion of the trial court and will not be reversed on appeal absent a showing that such discretion was clearly erroneous. *Thomas v. State,* 301 Md. 294, 317, 483 A.2d 6 (1984); *Testerman v. State,* 61 Md.App. 257, 265, 486 A.2d 233 (1985).

Under the facts and circumstances of this case, we do not think that the trial court's decision amounts to an abuse of discretion. In a pre-trial motion, the trial court ruled and admonished Mr. Smith's attorney that "you can't go into [the victim's] previous conduct." Nevertheless, appellant attempted to call the victim at trial and question her concerning other sexual contact she may have had shortly before the alleged attack. Appellant proffered that the source of semen found in the victim and on her clothes was in issue. That issue, he argued, had been generated during cross-examination of the State's chemist and the doctor who examined Ms. Spann following the attack. Both testified that vaginal swabs indicated the presence of acid phosphatase, a male sexual fluid, in Ms. Spann at the time she was

examined. Relying on Md.Ann.Code art. 27, § 461A(a)(2) (1982), defendant contends that evidence of the victim's prior sexual contact would establish a possible source, other than himself, of this acid phosphatase.

Ordinarily, limited evidence of specific acts of sexual intercourse by a rape victim within a short period of time prior to the alleged rape will not be so highly inflammatory or prejudicial to outweigh its probative value, where expert evidence establishes that such a contact could (to a reasonable certainty) account for the sperm or semen found in the post-rape medical tests. *See United States v. Kasto*, 584 F.2d 268, 271 n. 2 (8th Cir.1978); *People v. Mikula*, 84 Mich.App. 108, 269 N.W.2d 195, 198 (1978); *State v. Cosden*, 18 Wash.App. 213, 568 P.2d 802, 806 (1977); *McLean v. United States*, 377 A.2d 74, 78 (D.C.App.1977); *State v. Superior Court*, 113 Ariz. 22, 545 P.2d 946, 953 (1976); *State v. McDaniel*, 204 N.W.2d 627, 630 (1973); *Holland v. Commonwealth*, 272 S.W.2d 458, 460 (Ky.1954); *State v. Deen*, 69 Ariz. 188, 211 P.2d 460, 462 (1949).[12] For example, in *People v. Mikula, supra,* the defendant sought to admit evidence that the child prosecutrix had been involved in a sexual relationship with a fourteen-year-old boy in order to rebut the testimony of a doctor "that the complainant did

___

12. A number of commentators have considered the problem of the need to explain the presence of semen in an alleged rape victim where the defendant denies that sexual contact took place. *See, e.g.,* Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom,* 77 Colum.L.Rev. 1, 57–8 (1977), wherein it was said:

Consider the following hypothetical case: The prosecution, in attempting to prove the rape's occurrence, offers evidence that semen was found in the victim's vagina shortly after the alleged assault. The accused wishes to make a showing that on the very same day and prior to the medical examination, the woman had intercourse with X.... If the accused is not conceding that he committed the act (as, for example, by claiming consent) but rather is striving to point the finger at someone else, the law should not deny him crucial proof on these issues merely because it has the effect of revealing some of the victim's history, Placed in the scales of due process, the defendant's need to use this matter will, in the absence of *special factors,* clearly outweigh the state's general exclusionary interests.

(Emphasis added). *See also* Tanford & Bocchino, *Rape Shield* Laws and the Sixth Amendment, 128 U.Penn.L.Rev. 544, 584–5 (1980).

not have an intact hymenal ring and that her vaginal opening was unusually open for a child of her age," and in his opinion, "the findings were 'entirely consistent although certainly not diagnostic of' attempted or partial penetration by an adult penis." 260 N.W.2d at 197. The defendant argued that the intent of the Michigan Rape Shield Statute [13] was "to permit an accused to introduce specific instances of the complainant's sexual activity to show the origin of a physical condition offered as circumstantial evidence of defendant's guilt." *Id.* at 198. The court held that since the purpose of the doctor's testimony was to establish circumstantial evidence of penetration, an element of the crime of rape, the evidence was admissible. The court explained:

> It is well settled that where the prosecution substantiates its case by demonstrating a physical condition of the complainant from which the jury might infer the occurrence of a sexual act, the defendant must be permitted to meet that evidence with proof of the complainant's prior sexual activity tending to show that another person might have been responsible for her condition. *People v. Hunter,* 374 Mich. 129, 132 N.W.2d 95 (1965), *People v. Russell,* 241 Mich. 125, 216 N.W. 441 (1927), *People v. Keller,* 227 Mich. 520, 198 N.W. 939 (1924); *People v. Werner,* 221 Mich. 123, 190 N.W. 652 (1922).

. . . . .

---

**13.** The pertinent part of the Michigan Rape Shield Statute reads as follows:

> Sec. 520j. (1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
>
> . . . . .
>
> (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease. M.C.L. § 750.-520j(1)(b); M.S.A. § 28.-788(10)(1)(b).

We conclude, therefore, that the Legislature intended that evidence of specific instances of sexual activity *is admissible to show the origin of a physical condition when evidence of that condition is offered by the prosecution to prove one of the elements of the crime charged provided the inflammatory or prejudicial nature of the rebuttal evidence does not outweigh its probative value.*

*Id.* (emphasis added). Implicit in the court's holding, therefore, was the finding that under the facts of that case the inflammatory or prejudicial nature of the rebuttal evidence did not outweigh its probative value.

Similar reasoning was employed in *State v. Cosden,* 18 Wash.App. 213, 568 P.2d 802 (1977). In that case two very different stories were told by the defendant and the prosecutrix. She alleged he raped her. He said she voluntarily went with him in his truck, tried to seduce him, but he became psychologically impotent and so no sexual contact took place. 568 P.2d at 804–5. Medical and scientific evidence were admitted to show that sexual contact did, in fact, occur. To explain away the presence of sperm found in the victim, the defendant sought to prove that the prosecutrix had engaged in sexual intercourse with another man four days prior to the alleged rape. The defendant alleged, in a pretrial motion, that this evidence "was directly relevant to the material issue of whether or not defendant had engaged in intercourse with the victim." *Id.* 568 P.2d at 805. The trial court excluded the evidence. The appellate court held that "refusal to allow the evidence was not an abuse of discretion under the facts and circumstances of this case." *Id.* at 806. The court explained:

[N]either the prior case law nor the statute purports to establish a blanket exclusion where the purpose of the evidence is highly relevant to other issues which may arise in prosecutions of rape. *See State v. Simmons,* 59 Wash.2d 381, 368 P.2d 378 (1962); *State v. Geer, supra* [13 Wash.App. 71, 533 P.2d 389]. The case at bench affords an example.

Where the defendant denies any sexual contact with the victim, yet the post-rape medical tests show evidence of a recent sexual contact, then all recent sexual contacts which could account for those testing results become highly relevant on the issue of defendant's responsibility for the crime. And it would be unfair to deprive defendant of the right to show the test results are not necessarily inconsistent with his denial of sexual intercourse with the victim.

Normally, evidence of a single act of sexual intercourse by the victim of rape within a short period of time prior to the alleged crime will not be so highly prejudicial or inflammatory as to outweigh its probative value, where expert evidence establishes that such a contact could from a reasonable medical probability account for the sperm shown by the post-rape testing procedure.

Whether the evidence should be allowed on this issue requires the exercise of discretion by the trial court based upon the balancing process of the sort described in RCW 9.79.150(3)(d), namely, whether its probative value is substantially outweighed by the danger of undue prejudice. Necessarily, the offer of proof must be specific and a proper medical foundation must be made in the offer of proof to establish the probative value of the testimony.

*Id.* The court opined that although the defendant had proffered the date and person with whom the prosecutrix had recently had sexual intercourse, no medical foundation was offered to show that the four-day-old sexual contact could "in terms of reasonable medical probability account for the presence of the quantity of sperm shown on the slides." *Id.* at 807. Accordingly, the court held that the trial court had not abused its discretion in determining that the prejudice of admitting evidence of the victim's past sexual conduct outweighed the probative value of the evidence.

A final case illustrative of this principle is *Commonwealth v. Majorana*, 299 Pa.Super. 211, 445 A.2d 529 (Pa. 1982), another case in which the defendant asserted that

testimony concerning the prosecutrix's prior sexual contacts should be admitted "to explain the presence of semen and live sperm in [the prosecutrix's] vagina." 445 A.2d at 532. The defendant argued that he was entitled to explain that the reason the examining doctor found semen was not because of contact with him, due to the alleged rape, but because of earlier sexual contact with another man. In rejecting the defendant's argument, the court said:

> The holding urged by appellant and by the dissenting opinion would emasculate the Rape Shield Law. The statute is a clear command of the legislature. The *raison d'etre* of rape shield statutes is partially to correct the manner in which our criminal justice system has approached the victim of a sexual assault. *Commonwealth v. Strube*, 274 Pa.Super.Ct. 199, 204, 418 A.2d 365, 367 (1979), *cert. denied*, 449 U.S. 992, 101 S.Ct. 527, 66 L.Ed.2d 288 (1980). The statute also gets rid of the covert notion that a woman who says yes once cannot then be raped. *Id.* at 205–209, 418 A.2d 368–370.

*Id.* 445 A.2d at 532. Accordingly, the *Majorana* court held that the evidence of earlier contact was not admissible to explain the presence of semen.

The rule is clear. Whether evidence of prior sexual contact will be admitted to explain, *inter alia,* the presence of semen requires the trial court to determine whether the probative value of the evidence of the victim's prior sexual contact *substantially outweighs* the danger of undue prejudice. Md.Ann.Code art. 27, § 461A (1957). *See also Joyce*, 57 Md.App. at 246, 474 A.2d 1369. In order to establish the relevance and materiality required by the Rape Shield Statute, the offer of proof must be specific as to when the sexual contact took place and a proper medical foundation must be made to establish, scientifically, the probative value of the testimony. *State v. Cosden*, 18 Wash.App. 213, 568 P.2d 802, 806 (1977). We caution, however, that even where that proof is offered, ultimate admissibility rests within the sound discretion of the trial

judge. Here, the probative value of the victim's prior sexual conduct is minimal in light of Smith's failure to proffer any specific facts tending to show that the acid phosphatase was not his.

In addition, the foundation evidence proffered by the defendant was itself insufficient.[14] *See Cosden,* 568 P.2d at 806. The Rape Shield Statute is designed to encourage women to report and prosecute sexual assaults by limiting the admissibility of evidence of the victim's chastity or unchastity. *See* Comment, *Rape and Other Sexual Offense Law Reform in Maryland,* 7 U.Balt.L.Rev. 151, 157 (1972). To allow the defense to engage in a "fishing expedition" or to admit such evidence without a foundation

---

**14.** The defendant's proffer was as follows:

MR. BUCHHEISTER (defense counsel): Yesterday as we began the trial on Monday, the Court instructed both the State and the defense not to get into areas and not to get into the prior sexual conduct of the victim which I had no problem with because the State had indicated that they weren't going to talk about the sexual exams where there was either sperm or lack of sperm and that kind of thing; but yesterday in talking to the chemist and also to Dr. Ayres, I asked the chemist about acid phosphatase. There was not any acid phosphatase found on several different items. I never asked anything about spermatazoa.

The doctor testified that acid phosphatase is produced by males and it gets into the females through sexual intercourse. Now, there was no testimony about sperm. There was no testimony about semen. I purposely and assiduously avoided going into those areas so I would avoid getting into what the Court had instructed us not to.

Now, on redirect, Mr. Simpson went back and asked the chemist and the chemist then said that there was semen found on several different places that she testified to, on the pants and some other place if I am not mistaken, but at least the pants. I didn't go into that, but now the jury knows that semen was found.

The Rape Shield Law makes it clear. If you are talking about the presence or absence of semen, I have a right to indicate to a jury that the semen could have been there from the victim's activities on Thursday night, could have been there from her activities on Friday night. It is our position that she had indicated that a rape never occurred to medical authorities, and that is the position we intend to present to the jury. We have a right now to come back as a result of the State's questioning to show the jury an explanation for the semen that was testified to.

to show its relevance would be contrary to the intent of the statute. Because the "source of the semen" may be at issue in every rape case, the admissibility of recent sexual activities of the victim is limited to cases in which the relevance of the evidence is shown by laying a proper foundation. *Cosden,* 568 P.2d at 896. In the case *sub judice,* this could have been done by proffering that the victim had sexual intercourse at a reasonably specific time before the incident with a person other than the defendant and that, scientifically, prior sexual contact could have accounted for the physician's finding male fluids in her vagina on the date of the alleged rape.

In enacting the Rape Shield Statute, the legislature clearly intended to strike a balance between the need to protect victims from undue embarrassment at trial and the constitutional right of defendants to confront witnesses against them. In so doing, the legislature directed that judges consider the facts and circumstances of each case before ruling on the admissibility of evidence of a victim's prior sexual encounters. *See Joyce,* 59 Md.App. at 246, 474 A.2d 1369. The balancing process contemplated by the legislature is delicate, *Id.* at 248, 474 A.2d 1369, and, in order to weigh the evidence properly, the proffer by the defendant must be precise and clearly articulate both the relevance of the evidence as well as why it is not unduly prejudicial. Where, as here, the defendant alleges there was no sexual contact between himself and the prosecutrix, it is incumbent upon him to produce scientific, rather than purely speculative, evidence as to how the presence of semen and/or the injury to the victim occurred. This was not done in the case at bar. Accordingly, we hold that the trial court did not abuse its discretion in refusing to admit the evidence.[15]

---

**15.** We note that, as the doctor testified, "the semen samples were inconclusive as far as typing," the defendant was not precluded from suggesting in closing that the doctor's evidence corroborated the defense claim that no contact took place between the defendant and the prosecutrix. *See Cosden,* 568 P.2d at 807.

**190**

JUDGMENTS REVERSED; CASE REMANDED FOR A NEW TRIAL; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.