701 A.2d 1183

Wilbur **BELL**

v.

**STATE of Maryland.**

**No. 1830, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Oct. 31, 1997.

68

Daniel H. Weiss, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr. Atty. Gen, Baltimore and Jack B. Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for Appellee.

Argued before DAVIS, HARRELL and HOLLANDER, JJ.

HOLLANDER, Judge.

Wilbur Bell, appellant, was convicted after a non-jury trial in the Circuit Court for Prince George's County of second degree rape, attempted rape, assault with intent to rape, and assault and battery. With respect to the rape conviction, he was sentenced to a term of twenty years of incarceration, ten of which were suspended. For sentencing purposes, the other convictions were merged into the rape conviction. Four questions are presented on appeal:

1. Was the record sufficient to show that appellant's waiver of a jury trial was knowing and voluntary?

II. Did the trial court err in limiting cross-examination of the prosecutrix?

III. Did the trial court err in admitting "other crimes" evidence?

IV. Did the trial court err in restricting cross-examination of a State's witness?

We are of the view that the record is not sufficient to show that appellant's waiver of his right to a jury trial was made knowingly and voluntarily. Therefore, we shall vacate appellant's conviction and remand the matter for further proceedings. For the benefit of the trial court on remand, we shall address appellant's other contentions.

## FACTUAL SUMMARY

Appellant and Pamela Collins, the victim, had been involved in a romantic but stormy relationship for several years. They have one daughter, Erica Collins, who was six years old at the time of the incident on August 29, 1994 that gave rise to the underlying charges. When the incident occurred, Ms. Collins and appellant were no longer romantically involved.

On August 29, 1994, Erica completed her first day of school. Early that evening, Ms. Collins was in her apartment in Prince George's County with Erica and Virgil Beaty, a cousin of Ms. Collins who was then approximately eleven years old.[1] At approximately 5:30 p.m., while Ms. Collins was cooking dinner for Erica and Virgil, appellant knocked on Ms. Collins's door. Virgil opened the door, but he did not recognize appellant. He heard Erica and Ms. Collins refer to appellant as "Wilbur." At trial, Virgil identified appellant as the individual who was at the door when he opened it.

Ms. Collins told appellant to leave, but he said that he wanted to talk to Erica, and Ms. Collins allowed him to remain. While Erica ate dinner, she spoke to appellant about

---

1. Virgil was thirteen years old at the time of trial; the trial occurred twenty-six months after the incident.

her first day at school. After dinner, Erica and Virgil went outside to play, and Ms. Collins went into the kitchen to light a cigarette. When she returned to the dining area, she claimed appellant "grabbed [her], started choking [her] around [her] neck and told [her] he would hurt [her]." He then pushed and dragged Ms. Collins into her bedroom. According to Ms. Collins, when the two were in the bedroom, appellant pulled her down onto the floor and tried to pull her clothes off. Although she scratched and fought, Ms. Collins reported that appellant successfully pulled off her pants and raped her.

While appellant was still on top of Ms. Collins, Erica came back inside the apartment and entered Ms. Collins's bedroom. According to Ms. Collins, Erica "started screaming and hollering," and she told Erica to help her, but the child did not do so. Appellant told Erica to leave, which she did. Appellant eventually stopped and put his pants back on. Ms. Collins retrieved a steak knife from the dish drain in the kitchen and confronted appellant, who then left the apartment.

After appellant left, Ms. Collins "washed up" and changed her clothes. She notified the police and was advised to come to the police station, which she did. Thereafter, she returned with the police to her apartment and then proceeded to Prince George's County Hospital, where she was examined by a doctor. By stipulation, Ms. Collins's hospital records were admitted into evidence.

At trial, Ms. Collins conceded that she had no bruises on her neck, although she claimed appellant choked her. She also acknowledged that her clothes were not torn and the apartment did not show signs of a struggle.

Although Ms. Collins promptly filed charges against appellant, in April 1995 she requested that they be put on the stet docket. She explained that, at that time, she believed that appellant "was trying to change his life," that he had gotten married, and that he was developing a good relationship with Erica. She also stated that Erica enjoyed her relationship with appellant and his family, and she did not want to interfere with that relationship. Pursuant to her request, the

charges were stetted. Approximately one week after the charges were stetted, appellant came to the victim's apartment and raped her again. As a result of the second rape, Ms. Collins requested reinstatement of the charges.[2]

Erica, who was 8 years old at the time of trial, also testified for the State. She stated that when she returned to the apartment, the door to her mother's room was closed, but she entered without knocking. Erica testified: "I saw my father on top of my mother," and added that she saw her father's "back and his butt." Moreover, her mother was screaming, which "upset" Erica.[3] She also claimed that her father told her to "close the door," but her mother did not say anything. According to Erica, after her parents came out of the room, her father was "cussing" and her mother told appellant "to get out."

In addition, the State called two police officers who investigated the case. Police officer Carolyn Baker took a statement from appellant, in which he denied committing the offense. The police officers also acknowledged that no pubic hairs or seminal fluids were found on items recovered by the police from the victim's apartment. Nor was any DNA analysis conducted on the sperm recovered from the victim.

Appellant testified in his own defense. He told the court that he had previously lived with Ms. Collins, but he denied that he was at Ms. Collins's apartment on August 29, 1994. On the date of the incident, he said he was living with his girlfriend, whom he married in November 1994. He also recounted his whereabouts, but conceded that he had not provided that information in his statement to the police. Appellant also admitted that he was incarcerated in January 1994 because of Ms. Collins, and that he wrote threatening letters to Ms. Collins while he was in prison.

---

**2.** Ms. Collins testified that she did not know why charges resulting from the second rape were not prosecuted.

**3.** When Virgil returned to the apartment, he said that he found Erica in the living room, crying.

Additional facts will be included in our discussion of the issues presented.

## DISCUSSION

### I.

At the beginning of the trial, defense counsel indicated to the court that appellant wanted to waive his right to a jury trial. In response to the court's inquiry about whether counsel advised appellant of "the ramifications" of the waiver, counsel stated: "We have talked it over, Your Honor. We talked it over last time we were here, and *I haven't talked it over yet this morning with him.*" (Emphasis added).

Thereafter, defense counsel questioned appellant on the record. Counsel established that appellant was then 34 years old,[4] could read and write, and understood the charges and possible maximum penalties. The following colloquy then ensued:

[DEFENSE COUNSEL]: You and I talked about whether you should have a jury trial or judge trial, haven't we?

THE DEFENDANT: Yes, sir.

[DEFENSE COUNSEL]: And we came to the conclusion that we would like Judge Hotten to decide the case rather than a jury?

THE DEFENDANT: Yes, sir.

[DEFENSE COUNSEL]: Have I forced you to do that?

THE DEFENDANT: No, sir.

[DEFENSE COUNSEL]: Are you giving up your right to a jury trial freely and voluntarily?

THE DEFENDANT: Yes, sir.

[DEFENSE COUNSEL]: Has anyone promised you anything?

THE DEFENDANT: No, sir.

---

**4.** Defendant was actually 33 years old. When defendant testified at trial, he stated that he would be 34 on November the 13th; the trial occurred on October 22, 1996.

[DEFENSE COUNSEL]: Or offered you any inducement?

THE DEFENDANT: No, sir.

[DEFENSE COUNSEL]: Are you in good health mentally and physically?

THE DEFENDANT: No.

THE COURT: Have you taken any alcohol, medication or drugs?

THE DEFENDANT: No, ma'am.

THE COURT: **Do you understand if you were to have a jury trial, which would consist of twelve people, or whether you choose to have this member of the bench hear the case, the State would still have the burden to prove the charges against you beyond a reasonable doubt?**

THE DEFENDANT: Yes, sir [sic].

THE COURT: Have you been satisfied with the services of your attorney up to the present time?

THE DEFENDANT: Yes, ma'am.

THE COURT: Is there anything that's been said or anything that's been going on so far that you don't understand or have a question about?

THE DEFENDANT: No, ma'am.

THE COURT: At this time, knowing that you give up the right to a jury trial and that you are under the influence of no alcohol, medication or drugs, and that you are making this decision freely and voluntarily, is it your intention to give up or waive your right to a jury trial?

THE DEFENDANT: Yes.

THE COURT: Okay.

(Emphasis added).

## A.

■ Appellant complains that the record does not establish that he knowingly and voluntarily waived his right to a jury trial, because it does not reflect that he was advised that a jury's verdict must be *unanimous* in order to convict a

defendant. The State counters that there is no fixed incantation necessary to establish a knowing and voluntary waiver of the right to a jury trial, and that the circumstances demonstrate that appellant's waiver was, indeed, knowing and voluntary.

The right to a jury trial is, of course, a fundamental right. *Robinson v. State*, 67 Md.App. 445, 454, 508 A.2d 159, *cert. denied*, 307 Md. 261, 513 A.2d 314 (1986). Maryland Rule 4–246, which was adopted in 1984, governs the procedure for jury trial waivers. *State v. Hall*, 321 Md. 178, 182, 582 A.2d 507 (1990). It derives from the version of Rule 735 that was implemented in January 1982. *Id.* An earlier version of Rule 735, which was in effect until 1982, had required that, in order for a defendant validly to waive the right to a jury trial, the defendant had to have "full knowledge" of the right. In *Countess v. State*, 286 Md. 444, 408 A.2d 1302 (1979), the Court of Appeals explicated the extent of knowledge contemplated by the "full knowledge" requirement in the earlier version of Rule 735(d). Writing for the Court, Judge Orth said:

> What the Rule contemplates is that the defendant have a basic understanding of the nature of a jury trial. We think that this understanding is generally satisfied when the defendant entitled to a jury trial knows that he has the right to be tried by a jury of 12 persons or by the court without a jury; that whether trial is by a jury or by the court, his guilt must be found to be beyond a reasonable doubt; *that in a jury trial all 12 jurors must agree that he is so guilty* but in a court trial the judge may so find.

*Id.* at 455, 408 A.2d 1302 (emphasis added).

Although Rule 4–246 does not contain the full knowledge requirement that once appeared in Rule 735, it does require that a waiver be made "knowingly and voluntarily." The rule states, in pertinent part:

> (a) **Generally.**—In the circuit court a defendant having a right to trial by jury shall be tried by a jury unless the right is waived pursuant to section (b) of this Rule. If the waiver

is accepted by the court, the State may not elect a trial by jury.

**(b) Procedure for Acceptance of Waiver.**—A defendant may waive the right to a trial by jury at any time before the commencement of trial. The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, *that the waiver is made knowingly and voluntarily.*

(Emphasis added).

We must now determine whether the knowing and voluntary standard expressed in Rule 4–246 encompasses knowledge of the unanimity requirement, which the Court of Appeals found was clearly embodied in the predecessor to Rule 4–246. As we attempt to resolve this question, we are mindful that the unanimity requirement is one of the hallmarks of our jury trial process. Indeed, the fundamental nature of the unanimity requirement is demonstrated by its inclusion in Article 21 of the Maryland Declaration of Rights, which declares:

That in all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

Moreover, in recognizing the fundamental importance of unanimity, the Court of Appeals has stated:

Since a unanimous jury verdict is a fundamental constitutional right guaranteed the defendant in a criminal case, it can be dispensed with only when he "competently and intelligently" waives that right.

*State v. McKay,* 280 Md. 558, 572, 375 A.2d 228 (1977) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 469, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461 (1938)).

 Rule 4–246 ensures that a defendant who "expresses a desire to be tried by the court be afforded an opportunity to waive his right to a jury trial. That opportunity is afforded when the nature of a jury trial is explained to him along with

some explanation of the nature of a court trial and/or the distinction between the two modes of trial." *Thomas v. State,* 89 Md.App. 439, 446, 598 A.2d 789 (1991). There is, however, no "fixed litany" or script that must be followed to establish compliance with the requirements of Rule 4–246. *Tibbs v. State,* 323 Md. 28, 31, 590 A.2d 550 (1991); *see also Hall,* 321 Md. at 182, 582 A.2d 507; *Martinez v. State,* 309 Md. 124, 134, 522 A.2d 950 (1987); *Dortch v. State,* 290 Md. 229, 235, 428 A.2d 1220 (1981). As this Court explained in *Suggs v. State,* 52 Md.App. 287, 449 A.2d 424 (1982), the change in the rule was intended to "relax the requirement of the strict litany found in *Countess,* while, at the same time, assuring the defendant's right to a knowing and voluntary waiver." *Id.* at 291, 449 A.2d 424. Instead, compliance with the rule is determined based on the "facts and circumstances of each case," *Hall,* 321 Md. at 182, 582 A.2d 507, and the " 'totality of the circumstances as reflected by the entire record.' " *Robinson,* 67 Md.App. at 455, 508 A.2d 159 (quoting *Davis v. State,* 278 Md. 103, 109, 361 A.2d 113 (1976), with respect to a guilty plea); *see also Martinez,* 309 Md. at 134, 522 A.2d 950 (stating that a "competent waiver must depend on the unique facts and circumstances of each case").

Although no fixed litany is required, the Court of Appeals has consistently "urged trial judges ... to be thorough and detailed in conducting the waiver examination on the record. . . ." *Hall,* 321 Md. at 184, 582 A.2d 507. This is because

> [t]o satisfy constitutional due process standards, the waiver of a jury trial, a fundamental right, must constitute "an intentional relinquishment or abandonment of a known right or privilege." The Court of Appeals has made it clear that the "knowing and voluntary" language of former Rule 735 (and, we think, by logical implication, current Rule 4–246) was intended to incorporate the constitutional due process standard for waiver of a fundamental right but no more.

*Robinson,* 67 Md.App. at 454, 508 A.2d 159 (citation omitted).

Case law seems to indicate that a defendant's knowledge of the unanimity requirement is an essential component of a

knowing jury trial waiver. *Suggs,* for example, suggests that the unanimity requirement remains applicable in regard to whether a waiver was knowingly made. There, the petitioner claimed he did not voluntarily waive his right to a jury trial, because he was not told that the jury verdict must be unanimous. The trial court had told the defendant that if he chose a jury trial, "twelve people ... would sit in judgment of you and must find you guilty beyond a reasonable doubt and to a moral certainty in order to convict you of the charges." 52 Md.App. at 289, 449 A.2d 424. The defendant contended that because his trial was held before the effective date of revised Rule 735, the trial court was required specifically to advise him of the unanimity requirement, pursuant to Rule 735(d). We held that the revised rule was applicable and said:

> While it may be a close question whether the above colloquy satisfies the tenets of Md. Rule 735 b, it appears to us that the above instruction sufficiently conveyed the requirement of jury unanimity to the appellant.

*Id.* at 291, 449 A.2d 424; *see also Mayes v. State,* 50 Md.App. 628, 629–31, 440 A.2d 1093 (1982) (finding advisement sufficient to convey unanimity requirement).

More recently, in *Tibbs,* the Court of Appeals considered a defendant's waiver of a jury trial. The trial judge had inquired of the defendant if he knew what a jury trial was, if he specifically waived his right to a jury trial, and if he was giving up this right freely and voluntarily. To each of these questions the defendant replied in the affirmative. The trial court also inquired if the defendant had been forced or threatened to waive his jury trial right, to which the defendant responded "no." Nevertheless, the Court of Appeals concluded that the waiver violated due process, stating:

> Considering the totality of the circumstances in the present case, we hold that the record is woefully deficient to establish that Tibbs knowingly and voluntarily relinquished his right to a jury trial. The record fails to disclose that Tibbs received any information at all concerning the nature of a jury trial, as required by our cases. It is not sufficient that an accused merely respond affirmatively to a naked

inquiry, either from his lawyer or the court, that he understood that he has a right to a jury trial, that he knows "what a jury trial is," and waives that right "freely and voluntarily."

323 Md. at 31–32, 590 A.2d 550 (citations omitted). The Court also noted that the defendant's "prior unspecified experience with the criminal justice system" was not sufficient to establish a knowing and voluntary waiver. *Id.* at 32, 590 A.2d 550; *see also Dedo v. State,* 105 Md.App. 438, 451, 660 A.2d 959 (1995) (upholding jury trial waiver when court advised defendant, *inter alia,* of unanimity requirement but did not inform defendant of his right to participate in jury selection), *rev'd on other grounds,* 343 Md. 2, 680 A.2d 464 (1996).

In resolving the issue presented here, we are logically drawn to a consideration of the degree of information that a defendant must receive in order to plead guilty freely and voluntarily. The United States Supreme Court explained in *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), that a defendant who pleads guilty waives several constitutional rights, including the right to confront one's accusers, the privilege against compulsory self-incrimination, and the right we consider here—the right to trial by jury. Thereafter, the Court of Appeals determined in *Davis* that the validity of a guilty plea does not necessarily depend upon the enumeration of the rights mentioned in *Boykin.* The Court of Appeals held that, in accepting a guilty plea, a trial court is not required specifically to articulate, on the record, the three constitutional rights discussed in *Boykin.* Rather, "the record taken as a whole [must] affirmatively disclose[ ] that the petitioner's plea was ... voluntary and intelligent." 278 Md. at 118, 361 A.2d 113.[5] Thereafter, in *Robinson,* we observed that "because the entering of a guilty plea serves as a simulta-

---

**5.** In his concurring opinion, Chief Judge Robert C. Murphy disagreed with the majority's determination that the record need not reflect the enumeration of the three constitutional rights. He noted, however, that the trial judge in *Davis* did disclose these rights to the accused. *Davis,* 278 Md. at 119–20, 361 A.2d 113 (Murphy, C.J., concurring in the judgment).

neous waiver of three fundamental rights . . . , *Davis* and other cases addressing the standard for acceptance of a guilty plea apply with even greater force where waiver is of the single right of a jury trial." *Robinson,* 67 Md.App. at 455, 508 A.2d 159.

■■■ While we recognize that a defendant who pleads guilty waives the right to any trial, not just a jury trial, we are unable to conclude that the information needed in order to waive the right to a jury trial is necessarily coextensive with the information needed to enter an effective and valid guilty plea. The lack of a constitutional mandate that information about a jury trial be imparted to a defendant who pleads guilty does not diminish, in our view, the quantum of information that must be conveyed to a defendant in order to find a knowing waiver of the right to a jury trial.

Maryland Rule 4–242(c) governs the court's acceptance of a guilty plea; it merely requires, in part, that the court determine, "upon an examination of the defendant on the record in open court," that: "(1) the defendant is pleading voluntarily, with understanding of the nature of the charge and the consequences of the plea; and (2) that there is a factual basis for the plea." Moreover, the Court of Appeals has observed that the rules governing a jury trial waiver and a guilty plea are distinct. In *State v. Priet,* 289 Md. 267, 424 A.2d 349 (1981), the Court stated that the requirements governing a jury trial waiver are not "engrafted" on the rule pertaining to guilty pleas. *Id.* at 289, 424 A.2d 349. The Court reasoned:

> Granted that each rule is designed to assure that the accused have a basic understanding of the respective rights there sought to be protected, nevertheless, the two rules are separate and distinct. . . .

*Id.* Relying on *Matthews v. State,* 46 Md.App. 172, 416 A.2d 1314 (1980), the Court explained that the requirements of Rule 735 (the predecessor to Rule 4–246) were not applicable to Rule 731 (the predecessor to Rule 4–242) because, by its terms, Rule 735 was applicable only if the defendant elected to be tried by the court and, in pleading guilty, the defendant

elected not to be tried at all. *Priet*, 289 Md. at 289, 424 A.2d 349.

A defendant waiving the right to a jury trial must have the knowledge contemplated by Rule 4–246(b). As noted, earlier decisional law interpreting the predecessor rule to Rule 4–246(b) required that a defendant be advised that the jury's verdict must be unanimous. Although the language of the rule has changed, we do not believe that any less is required now with respect to unanimity than was required when the Court decided *Countess*. This is because, in our judgment, a defendant who is not shown on the record to know of the unanimity requirement cannot make a knowing waiver of his right to a jury trial.

■ Although not raised by appellant, we have also considered whether we may presume that appellant was aware of the unanimity element, because he had an attorney and they had previously "talked ... over" the jury trial waiver. The Court of Appeals has recognized a "long-standing rule that criminal defendants represented by counsel are presumed to have been informed of their constitutional rights, including the right to testify." *Thanos v. State*, 330 Md. 77, 91, 622 A.2d 727 (1993); *see also Stevens v. State*, 232 Md. 33, 39, 192 A.2d 73 (attorneys "are presumed to do as the law and their duty require them"), *cert. denied*, 375 U.S. 886, 84 S.Ct. 160, 11 L.Ed.2d 115 (1963). As best we can determine, however, the Maryland cases that have articulated this principle have done so in the context of a challenge to the voluntariness of a defendant's decision concerning the right to testify or remain silent. *See, e.g., Thanos*, 330 Md. at 91; *Fowler v. State*, 237 Md. 508, 515, 206 A.2d 802 (1965); *Stevens*, 232 at 39. As we have not found any case espousing this view with regard to a jury trial waiver, we decline to presume that appellant was aware of the unanimity requirement merely because he had counsel. We explain.

In *Gilliam v. State*, 320 Md. 637, 579 A.2d 744 (1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), the defendant complained about the erroneous advisement he

received from counsel regarding the testimonial election, as well as the trial court's failure to correct the advisement. The Court of Appeals rejected the claim; it recognized that trial judges are not required to inform represented defendants of their right to testify, unless it is "clear . . . that the defendant does not understand the significance of his election not to testify or the inferences to be drawn therefrom." *Id.* at 652–53, 579 A.2d 744. Indeed, the Court stated that counsel's colloquy with the defendant " 'on the record' explaining the right to remain silent . . . was a formality not required by any decision of this Court," and characterized the advisement as "gratuitous." *Id.* at 656, 579 A.2d 744.

Similarly, in *Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993), the defendant alleged, *inter alia*, that he did not knowingly and voluntarily waive his right to testify at a criminal responsibility hearing, because he was misadvised by his counsel. In rejecting this contention, the Court acknowledged its prior holdings "that there is a rebuttable 'presumption' that a represented defendant has been fully informed regarding his right to testify. . . ." *Id.* at 639, 612 A.2d 258. Consequently, it said that in the absence of " 'clear' indication in the record to the contrary, appellate courts will presume that whatever course of action the defendant ultimately takes at trial was in fact a voluntary decision made after a complete, but not necessarily on-the-record, consultation with defense counsel." *Id.* Thereafter, *Thanos*, to which we earlier referred, reaffirmed *Oken* and *Gilliam*. *Thanos*, 330 Md. at 91–92, 622 A.2d 727.

*Morales v. State*, 325 Md. 330, 600 A.2d 851 (1992), is not inconsistent with the cases we have just reviewed, even though the Court determined there that a defective advisement mandated the conclusion that the testimonial waiver was inadequate. The trial court undertook to advise an unrepresented defendant about his right to testify. In doing so, the judge incorrectly informed the defendant about possible impeachment based on all of his prior convictions. Moreover, the defendant indisputably relied on the erroneous advisement in

electing not to testify. On these facts, the Court concluded that the defendant did not knowingly and voluntarily waive his right to testify. The Court focused on the defendant's reliance on the incorrect advisement, but it reiterated that the trial court was not required to advise the defendant in the first place. Having done so, however, the judge had to do it correctly. *Id.* at 339, 600 A.2d 851.

As we see it, this line of cases is inapposite. It is abundantly clear that, by rule, a defendant must be advised, on the record, about the jury trial waiver. Moreover, a specific rule requires that the jury trial waiver must be knowing and voluntary, and the purpose of the rule would be thwarted if it could be so readily subverted. In contrast, there is no Maryland rule that governs a defendant's testimonial election.

The recent case of *Moten v. State*, 339 Md. 407, 663 A.2d 593 (1995), also persuades us that the Court of Appeals would not rely upon a presumption that Bell's counsel advised him of the unanimity requirement. In *Moten*, the trial court accepted the defendant's waiver of counsel, governed by Rule 4–215, after failing to advise the defendant of the penalties he faced; this failure violated Md. Rule 4–215. Nevertheless, because the record amply supported a finding that the defendant was acutely aware of the penalties, we found the error harmless and affirmed the conviction. *Moten v. State*, 100 Md.App. 115, 123, 640 A.2d 222 (1994). The Court of Appeals reversed. Writing for five members of the Court,[6] Judge Raker held "that strict compliance with Rule 4–215 is required and that the judge's advice ... did not satisfy this standard." *Moten*, 339 Md. at 411, 663 A.2d 593. It is particularly noteworthy that the Court rejected the State's argument that, when a defendant is represented by counsel, the defendant is "presumed to have been informed of the pending charges and the allowable penalties." *Id.* at 409, 663 A.2d 593.

---

**6.** Judges Rodowsky and McAuliffe dissented. They agreed with the Court of Special Appeals, concluding that the purpose of Rule 4–215(a)(2) was satisfied because Moten had actual knowledge of the possible penalty.

We also focus on the Court's recognition in *Moten* of the important rights that Rule 4–215 is intended to protect. Relying on *Parren v. State*, 309 Md. 260, 523 A.2d 597 (1987), the Court in *Moten* said:

> "[T]he purpose of Rule 4–215 is to protect that most important fundamental right to the effective assistance of counsel, which is basic to our adversary system of criminal justice, and which is guaranteed by the federal and Maryland constitutions to every defendant in all criminal prosecutions." We then emphasized that compliance with this Rule was strictly mandatory. The defendants' convictions were accordingly reversed, because "the noncompliance with that part of subsection (3) of § (a) of Rule 4–215 which requires that the trial court advise the defendants of the penalties allowed for the crimes charged against them, rendered their waivers of counsel ineffective."

*Moten*, 339 Md. at 411–12, 663 A.2d 593 (citations omitted) (quoting *Parren*, 309 Md. at 281–82, 523 A.2d 597).

We recognize that Rule 4–246 does not expressly require advisement as to unanimity, while Rule 4–215 specifically requires review of the charges and penalties. This is a distinction without a difference, however. The unanimity requirement is a vital element of the fundamental right to a jury trial. It is as important to a knowing waiver of the right to a jury trial as the knowledge of possible penalties is to a knowing waiver of the right to counsel.

It is also significant to us that the Court in *Moten* expressly refused to assume that attorneys properly advise their clients, even though the Court recognized the reality that counsel "routinely inform their clients of the charges and penalties they face...." *Id.* at 412, 663 A.2d 593. Again, the same reasoning and logic apply here.

To be sure, appellant was not a newcomer to the criminal justice system. The pre-sentence investigation indicates that

Bell had a prior record.[7] The report does not reveal, however, whether Bell ever had a jury trial, which would demonstrate prior experience with the unanimity requirement.[8] Moreover, in our review of the record, we have not found any indication that appellant had prior experience with the unanimity requirement. Thus, even if we could rely on a defendant's prior experience, such as his criminal record, as a substitute for an omission during an in-court waiver colloquy, this particular record does not establish that appellant had actual knowledge of the unanimity requirement. *See Tibbs*, 323 Md. at 32, 590 A.2d 550. Accordingly, we are compelled to conclude that the record does not reflect a knowing and voluntary waiver of appellant's right to a jury trial.

## B.

■ Appellant also contends that "the record is ... unclear as to whether [he] was ... mentally capable of making a knowing and voluntary waiver of his right to a jury trial," because he responded in the negative to a question by his attorney asking him if he was "in good health mentally and physically." We shall dispose quickly of this claim, as it is without merit.

It is true that the trial court did not specifically pursue appellant's response, or directly inquire as to any mental or physical infirmity from which appellant may have been suffering. Nevertheless, we disagree that the court made "no

---

7. The pre-sentence report reveals that appellant had numerous arrests, dating back to the early 1980s, for generally minor offenses, all in Prince George's County. Many of these cases were nol prossed or stetted. Appellant's record also reflects two acquittals and several convictions, including convictions for assault and battery, destruction of property, theft, and drug possession. He was also incarcerated on a number of occasions. Nevertheless, we cannot determine with certainty whether these convictions resulted from trials or guilty pleas. We note, however, that the report indicates that most of the incarcerations derived from violations of probation.

8. We note that the State has not asked us to take judicial notice of any prior proceeding in which Bell was convicted by a jury.

further inquiry." It is apparent that appellant's negative response to his attorney's question concerning appellant's health prompted the trial judge personally to question appellant. She followed up by asking appellant whether he was under the influence of alcohol, medication, or drugs. The judge also asked about appellant's understanding of the proceedings and whether he was satisfied with his attorney. The trial judge was uniquely qualified to assess appellant's demeanor and his behavior. We believe that from the answers to the questions posed by the court, coupled with the court's ability to assess appellant's demeanor, the trial court was satisfied that appellant had the mental capacity to waive a jury trial. In this regard, we are mindful of the "strong presumption that judges properly perform their duties." *Beales v. State*, 329 Md. 263, 273, 619 A.2d 105 (1993).

## II.

As noted, Ms. Collins contended that appellant raped her at her apartment after he came to see their daughter. She testified that, after the rape, she "washed up," changed her clothes, and called the police. Later that evening, she was examined at the Prince George's County Hospital sexual assault center. Appellant denied that he was the person who had sexual intercourse with Ms. Collins. He asserts here that the trial court deprived him of his right to pursue the defense of misidentification.

During cross-examination of Ms. Collins, defense counsel asked her about her visit to the police station. The following colloquy is relevant:

[DEFENSE COUNSEL]: You were asked by the police if you had had sex within the last seventy-two hours with anyone else, right?

[PROSECUTOR]: Objection, objection.

THE COURT: Basis?

[PROSECUTOR]: Your Honor, I believe that's getting into the area of the rape shield statute. I don't think it's relevant, the long and short of it.

[DEFENSE COUNSEL]: Your Honor, I am asking questions the police officer asked her on the statement, which would have an effect on the physical examination and those results.

The trial court sustained the objection. Subsequent to Ms. Collins's testimony (and that of the other State's witnesses), a certified copy of the medical report for Ms. Collins was admitted into evidence by stipulation. The report indicated that no sperm was present in the external portion of Ms. Collins's genitalia, but there was sperm in the endocervix.

In light of this report, appellant contends that the trial court erred in not allowing him to inquire of Ms. Collins as to whether she had engaged in sexual relations in the seventy-two hours preceding the alleged rape and subsequent physical examination. He contends that this question falls within the exception to the rape shield law, which permits evidence of specific instances of sexual activity to show the source or origin of semen. Further, he points to the importance of such an inquiry, because the trial court clearly relied on the medical report; the court commented that the presence of sperm in the endocervix, but not in the external genitalia, was "absolutely consistent in the Court's finding with Miss Collins' version of the sex assault taking place and her washing up." Thus, appellant asserts that from the mere presence of sperm the court was persuaded that it was appellant who had sexual intercourse with Ms. Collins, even though no scientific or DNA analysis was performed on the sperm to establish that it was appellant's.

In response, the State relies primarily on the rape shield law. It also contends that, in the exercise of its discretion in regulating cross-examination, the trial court was entitled to restrict appellant's proposed line of inquiry. Further, the State points out that, at the time of appellant's question, the medical report was not in evidence, so that appellant was not entitled to pursue the inquiry at the particular time that he

sought to do so.[9]

Maryland Code Ann., Article 27, § 461A provides, in pertinent part:

(a) *Evidence relating to victim's chastity.*—Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

\* \* \* \*

(2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma. . . .

The rape shield law was enacted to protect rape victims from harassment and to encourage victims to report sex crimes. *Shand v. State,* 103 Md.App. 465, 476, 653 A.2d 1000 (1995), *aff'd,* 341 Md. 661, 672 A.2d 630 (1996); *see also Johnson v. State,* 332 Md. 456, 464, 632 A.2d 152 (1993); *White v. State,* 324 Md. 626, 634, 598 A.2d 187 (1991). To be admissible under the statute, evidence of " 'specific instances of a victim's prior sexual conduct' must 'fit within one of the enumerated exceptions and be found by the trial court to be relevant and material to a fact at issue in the case and to have probative value greater than its inflammatory or prejudicial nature.' " *Shand,* 103 Md.App. at 475, 653 A.2d 1000 (quoting *Johnson,* 332 Md. at 464, 632 A.2d 152). The exceptions to the prohibition against evidence of a victim's prior sexual conduct are designed to enable " 'a defendant to bring up the victim's

---

9. The State also argues that Bell failed to preserve for review his complaint regarding the scope of cross-examination. As we disagree, we shall not address this claim.

conduct *when necessary to the defense.*' " *Id.* at 476, 653 A.2d 1000 (emphasis added) (quoting *White,* 324 Md. at 636, 598 A.2d 187). The trial court's ruling with respect to the admissibility of evidence concerning a victim's past sexual conduct is subject to review based on an abuse of discretion standard. *Johnson,* 332 Md. at 464, 632 A.2d 152.

■ As we see it, *Smith v. State,* 71 Md.App. 165, 524 A.2d 117 (1987), which neither party cited, governs our resolution of appellant's contention. There, the defendant sought to call the victim as a witness at his rape trial, in order to question her about her prior sexual conduct. Although the appellant claimed it was necessary to explain the source of the semen found in the victim, the trial judge barred the testimony. We concluded that the trial court did not abuse its discretion, and that appellant's due process rights were not violated. We recognized that "[o]rdinarily, limited evidence of specific acts of sexual intercourse by a rape victim within a short period of time prior to the alleged rape will not be so highly inflammatory or prejudicial to outweigh its probative value...." *Id.* at 183, 524 A.2d 117. Indeed, when the defendant denies that he had sexual contact with the victim, but post-rape tests establish recent sexual contact, those contacts may well be relevant with regard to the issue of the defendant's culpability. *Id.* at 186, 524 A.2d 117. Nevertheless, evidence of prior sexual intercourse is not automatically admissible.

■ What the Court said in *Smith* is dispositive here:
The rule is clear. Whether evidence of prior sexual contact will be admitted to explain, *inter alia,* the presence of semen requires the trial court to determine whether the probative value of the evidence of the victim's prior sexual contact *substantially outweighs* the danger of undue prejudice. In order to establish the relevance and materiality required by the Rape Shield Statute, the offer of proof must be specific as to when the sexual contact took place and a proper medical foundation must be made to establish, scientifically, the probative value of the testimony. We caution, however, that even where that proof is offered, ultimate

admissibility rests within the sound discretion of the trial judge. Here, the probative value of the victim's prior sexual conduct is minimal in light of Smith's failure to proffer any specific facts tending to show that the acid phosphatase [a male sexual fluid] was not his.

\* \* \* \*

To allow the defense to engage in a "fishing expedition" or to admit such evidence without a foundation to show its relevance would be contrary to the intent of the statute. Because the "source of the semen" may be at issue in every rape case, the admissibility of recent sexual activities of the victim is limited to cases in which the relevance of the evidence is shown by laying a proper foundation. In the case *sub judice*, this could have been done by proffering that the victim had sexual intercourse at a reasonably specific time before the incident with a person other than the defendant and that, scientifically, prior sexual contact could have accounted for the physician's finding male fluids in her vagina on the date of the alleged rape.

In enacting the Rape Shield Statute, the legislature clearly intended to strike a balance between the need to protect victims from undue embarrassment at trial and the constitutional right of defendants to confront witnesses against them. In so doing, the legislature directed that judges consider the facts and circumstances of each case before ruling on the admissibility of evidence of a victim's prior sexual encounters. The balancing process contemplated by the legislature is delicate, and, in order to weigh the evidence properly, the proffer by the defendant must be precise and clearly articulate both the relevance of the evidence as well as why it is not unduly prejudicial. Where, as here, the defendant alleges there was no sexual contact between himself and the prosecutrix, it is incumbent upon him to produce scientific, rather than purely speculative, evidence as to how the presence of semen and/or the injury to the victim occurred. This was not done in the case at bar.

Accordingly, we hold that the trial court did not abuse its discretion in refusing to admit the evidence.

*Id.* at 187–89, 524 A.2d 117 (footnote and citations omitted).

As in *Smith,* appellant sought to engage in a "fishing expedition." He failed to lay any foundation as to prior sexual contact that "scientifically ... could have accounted for the physician's finding male fluids in her vagina on the date of the alleged rape." *Id.* at 189, 524 A.2d 117.

### III.

As we noted, the parties' child testified for the State. Erica identified appellant as her father, and related to the court her version of the events of August 29, 1994. Appellant challenges that portion of Erica's testimony in which she said appellant burned Ms. Collins's clothes and broke her car windows. He argues that the testimony constituted impermissible "other crimes" evidence. He also asserts that the testimony was not relevant, and that the trial court erred when it ruled that he "opened the door" to such testimony.

Erica stated that her parents frequently argued. The following colloquy, which occurred during cross-examination, is relevant:

[DEFENSE COUNSEL]: Your mom and your dad have had a lot of disagreements in the past; isn't that right?

[THE WITNESS]: Yes.

[DEFENSE COUNSEL]: Your mom gets mad at your dad a lot, doesn't she?

[THE WITNESS]: Yes.

[DEFENSE COUNSEL]: She's called the police on him before too, hasn't she?

[THE WITNESS]: Yes.

The State did not immediately object. After defense counsel asked Erica about visitation with appellant, and what her parents argued about, the prosecutor objected. Defense counsel argued that the questions were relevant to bias on the part of Ms. Collins, and the objection was then overruled. Erica

responded that her parents argued about money and about her. She also stated that her father wanted to see her more, but that her mother did not want him to.

On redirect examination, the prosecutor asked Erica why her mother had called the police about her father. The following is relevant:

[PROSECUTOR]: Now, you know about the times that your mother has called the police on your father, don't you?

[THE WITNESS]: Yes.

[PROSECUTOR]: Why has your mother called the police on your father?

[THE WITNESS]: Because—

[PROSECUTOR]: What did he do to make her do that?

[THE WITNESS]: Sometimes—

[DEFENSE COUNSEL]: Objection.

THE COURT: Basis?

[DEFENSE COUNSEL]: As to specific times, Your Honor, it's irrelevant as to what other times there were, as to what the reasons might have been. We'd actually have several trials if we went through all of that.

THE COURT: You opened the door. Overruled.

[PROSECUTOR]: You can answer. What did your father do to make your mother call the police on him?

[THE WITNESS]: Sometimes he would—sometimes when—I think one time when I was over his mother's house, he tried to come get me, because when I was going—I was in—I don't remember what school I was in then, but sometimes he would come get me off the bus. And he wasn't supposed to, my uncle was. My Uncle Dukie—my Uncle James.

Thereafter, the prosecutor asked Erica whether her father ever did anything directly to Ms. Collins to make her call the police. Defense counsel objected and the trial court instructed the prosecutor to rephrase his question. The following then occurred:

[PROSECUTOR]: Let me ask you this, can you remember anything specific, anything in particular that your father did to your mother to make your mother call the police on him.

[THE WITNESS]: No, but I know he did something to her clothes before.

[PROSECUTOR]: To her clothes. What did he do to her clothes?

[DEFENSE COUNSEL]: Objection, unless she knows when, Your Honor.

THE COURT: Lay the foundation.

[PROSECUTOR]: What you are getting ready to tell us about, what he did to her clothes, do you know about when he did that?

After telling the court that the incident referred to occurred "maybe two months" before the rape, Erica stated that appellant burned some of Ms. Collins's clothes and ripped some of them. The prosecutor then asked Erica whether appellant ever did anything to Ms. Collins's car, to which Erica replied that he had. The prosecutor then elicited from Erica that, prior to the rape, appellant broke the windows of Ms. Collins's car.

 Preliminarily, the State argues that appellant waived his claim of error because he failed timely to object at trial. *See Bruce v. State,* 328 Md. 594, 627–30, 616 A.2d 392 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993). Moreover, the State alleges waiver because appellant failed to articulate at trial that the testimony constituted "other crimes" evidence, but did assert other grounds for his objection. We agree with the State that the issue of whether Erica's testimony constituted impermissible "other crimes" evidence is not properly before us. With respect to the clothing incident, appellant objected on the ground that the testimony was not specific as to the time of the incident. This deficiency was corrected, and no further objection was lodged. With respect to the car, he objected because the prosecutor was "fishing around and leading" Erica. When a party specifies particular grounds for an objection, the party is deemed to

have waived all other grounds not mentioned. *Brecker v. State,* 304 Md. 36, 39–40, 497 A.2d 479 (1985); *Jeffries v. State,* 113 Md.App. 322, 341, 688 A.2d 16, *cert. denied,* 345 Md. 457, 693 A.2d 355 (1997); *Thomas v. State,* 104 Md.App. 461, 465, 656 A.2d 799 (1995). On the basis of the reasons advanced by Bell, the trial court did not abuse its discretion in overruling the objection.

 We note, however, that even if the objection were preserved, we would find no error in the trial court's decision to admit the testimony. Appellant contended that the rape and related charges against him were the result of a "messed up" relationship with Ms. Collins. Defense counsel elicited from Erica that her mother had called the police about appellant and that appellant and Ms. Collins argued about her and about money. He also established that Ms. Collins did not want appellant to see Erica as much as appellant would have liked. Further, appellant apparently sought to suggest that Ms. Collins called the police in order to harass him. Under these circumstances, we reject appellant's claim that he did not "open the door" to testimony elicited by the State to explain why Ms. Collins called the police. *See Clark v. State,* 332 Md. 77, 84–86, 629 A.2d 1239 (1993).

## IV.

Appellant denied that he was present at Ms. Collins's home on the day of the rape. As we noted, Virgil identified appellant at trial as the person who was at the door of Ms. Collins's apartment when he opened it. Appellant contends that the trial court deprived him of his right to test Virgil's credibility. We disagree.

Virgil had given a statement to the police on the night of August 29, 1994. The prosecutor used Virgil's prior statement to refresh his recollection as to what happened after Ms. Collins and appellant left Ms. Collins's bedroom. During cross-examination of Virgil, appellant referred to a portion of the statement in which Virgil had stated that he had not recognized appellant when he first opened the door. Virgil

acknowledged that he had not seen appellant before that evening. During redirect examination, Virgil affirmed his identification of appellant as the individual he let into the Collins apartment and testified that Ms. Collins looked mad when she came out of the bedroom. On recross, appellant attempted to ask Virgil the following four questions related to his identification of appellant:

Mr. Beaty, since the date of this incident, how many times have you laid eyes on [appellant]?

Now, Mr. Beaty, when you were asked who was the man you let in the house, you told the police officer, "At first I didn't know him"; isn't that right?

Now, have you talked about this case with Pam since August the 29th of 1994?

Did [the prosecutor] talk to you about pointing out [appellant] in the courtroom today?

The trial court sustained the prosecutor's objections to each question.

The scope of cross-examination is within the sound discretion of the trial court, and the trial court's ruling ordinarily will not be disturbed unless that discretion is abused. *See Oken,* 327 Md. at 669, 612 A.2d 258. Although the trial court "must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices," *Smallwood v. State,* 320 Md. 300, 307–08, 577 A.2d 356 (1990), the court nonetheless may impose reasonable limits on cross-examination that is repetitious or only marginally relevant. *Id.* at 307, 577 A.2d 356. Moreover, the scope of cross-examination is properly limited to matters that have been touched upon in direct examination. *Coates v. State,* 90 Md.App. 105, 111–13, 600 A.2d 856 (1992).

The first question counsel asked Virgil was how many times since the date of the incident he had seen appellant. Virgil had previously been questioned about how well he knew appellant. This question merely sought to rehash a subject that had already been covered and was of marginal relevance. Therefore, the trial judge was within her discretion in sustaining the prosecutor's objection.

The gist of the second question, concerning whether Virgil recognized appellant initially, had already been answered on direct and cross-examination. Again, the trial court was within its discretion in sustaining the prosecutor's objection.

The third and fourth questions focused on whether Virgil had spoken to Ms. Collins or the prosecutor about the case. These questions were beyond the scope of redirect examination. As Virgil's ability to recognize appellant had been dealt with at length on cross-examination, we conclude that the trial court did not abuse its discretion in excluding those questions on recross-examination.

JUDGMENTS VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS.

COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.